Madam Clerk, please call the final case. Call. 213, 8th Grade Street, Larry Weaver v. City of Belgium Counsel. May it please the Court, Counsel. My name is John Harp and I represent Larry Weaver in regards to his work-related accident with the City of Belgium. Your Honor, the medical experts in this case, including the Respondent's own orthopedic surgeon, agree that there could be only one cause for Mr. Weaver's injury, and that one cause is a traumatic event. The only one traumatic event in the records within the evidence is that Mr. Weaver reported an injury on May 9, 2010. There's no other events referenced in the evidence, and that uniformity, therefore, brings us to the manifest weight, which supports one conclusion, that Mr. Weaver lost his leg in a compensable work-related accident that arose out of and in the course of his employment with the City of Belgium. This Court reviews a lot of manifest weight cases, and this one is extraordinary. This is not a case about competing experts, nor is it a case where there's competing testimony of the witnesses regarding the material facts of the time, manner, and nature of the injury. This is a case about medical causation, and the undisputed testimony of the petitioner regarding the accident. I'd like to talk briefly about the cooperation of the medical experts. Both medical experts in this case, the treating physician, Dr. Dutelas, and Dr. Kodros, agree that due to Mr. Weaver's severe peripheral neuropathy, that an occult fracture may have occurred on May 8, 2010, from the twisting and stumble he described in his report on May 9, 2010. Number two, the fracture did not cause pain or initial instability. Three, the fracture was worsened by the continual ambulation. Four, that it ultimately gave way on May 9, 2010, when he heard the popping sound at his brother's home. Five, the fracture was worsened. The fracture would have caused swelling and discoloration. Six, with the normal rolling of a foot, walking on a flat surface would not have caused this injury. And seven, only a trauma, a severe trauma, as they state in the deposition transcripts, that a severe trauma involving the combined twisting and force, or toration, would have caused an injury of this magnitude. We believe this case is analogous with Montgomery Elevator, in regard to the fact that we have cooperating medical experts, and that, by and large, the petitioner's testimony regarding the time, manner, and place of the accident is undisputed. And that the Commission's failure to review the evidence in its entirety means their decision is against the manifest weight of the evidence. It really boiled down to, I mean, the Commission adopted the arbitrator's findings. The arbitrator did not find the claimant credible, based on various things, like there was nothing in the medical records that he saw swelling the day before, and so forth and so on. Tough as it is, in a case like this, that's the Commission's job, isn't it? I believe it's the Commission's job. However, when it is clearly evident from the plain and indisputable weight of the evidence, this Court can decide otherwise. I also, in regard to the credibility determination, the arbitrator found him credible at points in his testimony. She dispels that there's discrepancies between the initial triage note at St. Joseph's, and his report of the injury, and his testimony. But she dismisses this discrepancy, given Mr. Weaver's limited intellectual abilities. Now, that being said, she says he's not credible when it becomes an issue of time, as to what time he noticed the discoloration or swelling. The arbitrator herself became confused with the questions in the cross-examination, asked for a clarification at that point. And it was mentioned that he took the shoe off when he returned home and noticed swelling, and the question became whether he could notice discoloration. Well, he couldn't notice discoloration at that time, as it was an impossibility, because he still was wearing his socks. And he couldn't see through the socks, so he didn't notice the discoloration until he went to bed that evening. The respondent stated in the brief that the testimony of the swelling is contradictory, but there's no evidence that anyone requested information or asked him a question about the swelling on May 8th, prior to stumbling or prior to falling at his brother's house. There's no indication that the question was asked in the ER records, in the records of Dr. Gattelis, Dr. Kodros, or even from the supervisor, Richard Hornbreed. The only time that Mr. Weaver was asked about swelling prior to his fall on May 9th was when he was testifying. Now, the records of St. Joseph's, as we've mentioned in our brief, are inconsistent upon themselves. The arbitrator did rely on us. In one section, it says that his pain is 10 out of 10. That contradicts the testimony of both the orthopedic surgeons, that he did not feel pain. In fact, at St. Joseph's, when he actually has an evaluation, a musculoskeletal evaluation, he tells the nurse that he's actually just merely uncomfortable. That when he's already had a severe fracture that the treating physician describes as being one of the most severe in nature. The other is that the triage note indicates that he stepped on something and rolled his ankle, while the note later at the history given by the musculoskeletal examination is that he was merely walking, felt a pop and fell. That is consistent with his testimony. That is consistent with what he told Dr. Gateles. It's consistent with what he told Dr. Kodros. So there are no inconsistencies with regard to that testimony. We believe that there's only one cause for Mr. Weaver's accident, and that was the work-related accident on May 8th, 2010. We believe that it was clear that it arose out of in the course of his employment. And we ask that this Court reverse the decision of the Workers' Compensation Commission and fine for the plaintiff. Thank you, counsel. May it please the Court. Thank you. My name is Douglas L. Redbeer on behalf of the City of Elgin. In this case, the procedural history briefed, procedural history of the case is the commission and the circuit court found that Mr. Weaver failed to prove that his accident arose out of and in the course of his employment. The relevant standards of view, obviously, is the manifest weight of the evidence. And basically what the case boils down to is credibility. I agree that credibility is the key issue in the case, specifically Mr. Weaver's credibility. And there's various, the cumulative effect of the various points mentioned in the commission's decision, and arbitrator's decision. You know, it's understandable, and we see it in a lot of cases where the commission says, well, the petitioner's story doesn't match up with what he told medical providers and things like that. Yes. But this is a person with a 68 IQ reading comprehension at the second grade level. Right. I mean, to what extent do we expect someone with that kind of mental capacity to be able to consistently, I mean, it seems a little harsh to hold that person to the same standard as you do someone with normal intelligence. Right. And I think, well, the arbitrator did take that into account in the commission in her decision, when she addressed the medical records. It's the elton's position that, I mean, we're not talking about when someone gets hurt, you don't have to have a great level of intelligence or something that, and if you look at the records, they're very specific about what he said. So they weren't, this wasn't some big narrative. When he testified in court, I was at the trial, he was very, if you read the record, there was no, he could communicate fine. There was no issue where he had to take breaks or he didn't understand anything. His background, he plays golf. He testified that he was a supervisor. And he had difficulty reading, obviously, but I don't think that that, I don't think, again, it doesn't take an extremely high IQ or level of intelligence to tell somebody, if you were hurt less than an hour ago, exactly what happened. And so that, so I think that was taken into account, but that was just one, the medical records was just one item that the arbitrator and the commission took into account. And so I don't think that that, it's not like he could not communicate at all, to answer your question. So there are a lot of, when you look at these cases, there's the other issues that I'd like to go through here as to his credibility is, first of all, obviously he alleges he injured himself after starting work at 5 a.m. on Saturday, May 8th. He was working, he alleges he was working on some softball fields and twisted his ankle. He was also testifying that he was aware that work injuries had to be reported immediately. He did not report them to any of his coworkers. He did not report it to his supervisor. He worked until, well, he claims he worked a full day beyond 8.30 to 3 o'clock, whereas his supervisor said, no, it was 8.30. But even if he worked an additional, you know, until 3 o'clock, 3.30, he still didn't report it to anybody. And so he didn't, then he went home, and then there's the testimony that went back and forth as to when he found out he had this bruising or, the bruising in his ankle when he got home, whether it was at 3 o'clock or 5 o'clock or 8 o'clock or whenever it was, that was another inconsistency in his reporting. But the point is, he didn't report his injury when he got home, when he found out that he had a problem with his ankle that was swelled up and discolored. The next morning, he gets up and he testified that he was going to go help his brother cut his lawn for him. The reason why I went through all that in very detail, I was trying to figure out exactly when did he, why didn't he report it, when was he aware of his injury. And so he doesn't report it the morning that he wakes up. He goes, then he goes to his brother's house. The first time that he reports an injury is after he goes to the hospital and they verify a fracture in his ankle, and he tells his supervisor at that point in time, oh, I think I heard it the day before, but I woke up this morning and my ankle was fine. So there is, contrary to what counsel says, there is testimony from himself as documented by his supervisor in his employment file and testimony that when he told him, he offered himself in the morning he woke up and his ankle was fine. It wasn't until he went to his brother's house to help him cut his lawn is that when he noticed there was a problem. So again, these are all these cumulative effect of all these inconsistencies, one of which is the medical records, and his other statements undermine his credibility. Then we talked about the ankle being black and blue when he reported it. And the other thing, if you think about this from just a common sense standpoint, if he did have bruising and discoloration in his ankle and he gets up in the morning and he notices and looks at it, it doesn't make any sense that he would go over to his brother's house to help him mow his lawn if he's got a bad ankle and he can barely move it or whatnot. So from that perspective, it doesn't... It doesn't make any sense compared to what other person. I mean, I get back to he's got a 68 IQ. Right. I mean, it doesn't make any sense to you. Right. You wouldn't have done that. Sure. Right. Don't we have to put this in context in some way? Well, I would think that somebody with his level of IQ would not. If he's ruling that he's got a very bad ankle, he's not going to be walking over there. I don't think there's any testimony by an expert about anything like that. Right. Exactly. And if you look at the medical records themselves, they're very specific. And there is really no inconsistency. The most detailed medical record is the medical record by the doctor and the nurse, where, again, he says he complains of left ankle pain, states that he rolled his ankle a week ago but has been ambulatory without pain. Today he rolled his ankle again, heard and felt a pop, unable to weight bear, et cetera, et cetera. And you go through all this level of pain that he had. And what he did testify to is when he first injured his ankle, he felt pain right away or shortly thereafter. So it's true that he is a diabetic, and he has a difficulty appreciating the same level of pain as somebody that's not a diabetic. But I think the record is consistent with that. So the respondent's or the elgin's position is what really happened is he went on May 9th to his brother's house and was cutting his lawn and most likely rolled his ankle while he was cutting his lawn. And there's some additional evidence. If you just look at the timing of his injury, he said his injury occurred or he went to mow his lawn at his brother's house at 8, 10 in the morning he got there. He arrived. And he lives in Elgin, and his brother is in Elgin. But if you look at the medical records and the hospital records, he doesn't show up to the hospital until 1130. It doesn't take two to three hours to drive from Elgin. So there's some inconsistency even if you just look at the objective timing of the injury as he testified. Again, as far as the medical testimony, what the arbitrator relied on was the doctor to tell us, the treating orthopedic physician, what he said was he didn't say that he didn't opine, more probably true than not, that he injured his ankle and fractured on May 8th and then it came unstable on May 9th, and that's when it all manifested. In fact, as I mentioned, I won't go through it in the brief, as I stated in the brief, but what he said was it's possible but highly unlikely is what he said that that could happen. He wasn't even aware that that was an issue until we presented him with that hypothetical in the deposition. And Dr. Kudros had the same opinion. We gave him various hypotheticals, and his bottom line conclusion was that the actual injury, the ankle fracture occurred on May 9th, not May 10th. So based on all of those, I think that, again, this is a manifest way of the evidence. It's unfortunate that from Mr. Weaver's perspective, and he'd like to take into account his limited intellectual ability, but I think still, when he had the capacity, as he testified to, to communicate fine, he may not be able to read as well, but I think the evidence clearly shows that the manifest way of the evidence is not that or the manifest way of the evidence actually clearly supports the finding that his injury, that he did not prove that his injury occurred in the course of and in the scope of employment, or rise out of the scope of employment. Thank you, counsel. Counsel, you may reply. I have a few points with regard to counsel's statements. First of all, we do take Mr. Weaver into context. He has severe diabetic neuropathy. He's had prior ankle and foot problems. So this may not, discoloration and swelling may not have been unusual to him. On May 8th, when he left, they make a big issue, the respondent makes a big issue of him not reporting it. He will never state, he's never stated that he reported on that day. He stated that he didn't know that he was injured on that day. So to take him into context as the petitioner, I believe that is important, because he did not have the knowledge to report this until the collapse at his brother's house, when the ankle became unstable. Now, also in Dr. Gitalis's statements, I'm going to move to Dr. Gitalis's statements that counsel had mentioned. Dr. Gitalis mentioned that Mr. Weaver had the inability to feel sensation in that leg, in that extremity. Not that he felt a little bit of pain, a little bit of that, he did not have sensation in that leg. The inability, which I feel is, inability is significant. He states that in his testimony. Furthermore, when given the hypotheticals about the continued walking on the fractured ankle, Gitalis actually states that it is completely conceivable, because the ankle would have, the ankle was stable until it was no longer stable. And it also plays into Dr. Kodra's statement that this accident, this injury was to such a severe nature because of the continued ambulation. Dr. Gitalis states that when he was told of the ambulation and that the injury occurred the day before, upon his review of the statement of the petitioner in the initial patient questionnaire, that he was not surprised. And that's in the transcript. Now, the last point that I'd like to make is that Mr. Weaver did not write the triage records at St. Joseph's. He did dispute them in his testimony, that they contained his description of the accident and also the pain, as I've already mentioned. For those reasons, we ask that you reverse the decision. Thank you very much. Thank you, counsel, both for your arguments. This matter will be taken under advisement. A written disposition shall issue. The court will stand adjourned, subject to call. Thank you.